

# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs April 19, 2017

## STATE OF TENNESSEE v. REGINOLD C. STEED

**Appeal from the Criminal Court for Davidson County**
**No. 2015-B-1337     J. Randall Wyatt, Jr., Judge**

_____

### No. M2016-01405-CCA-R3-CD

_____

A Davidson County jury convicted the Defendant, Reginold C. Steed, of attempted voluntary manslaughter, especially aggravated robbery, and aggravated assault. The trial court merged the aggravated assault conviction into the especially aggravated robbery conviction and imposed an effective sentence of twenty-seven years. On appeal, the Defendant contends that (1) the jury returned inconsistent verdicts; (2) the trial court erred in declining to merge the attempted voluntary manslaughter conviction into the especially aggravated robbery conviction; and (3) his sentences are excessive. Upon reviewing the record and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Chad Davidson, Nashville, Tennessee (on appeal and at sentencing hearing); Dawn Deaner, District Public Defender; and Martesha Johnson and Kevin Griffith, Assistant District Public Defenders (at trial), for the appellant, Reginold C. Steed.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Glenn Funk, District Attorney General; and Jude Santana, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTUAL AND PROCEDURAL HISTORY

The evidence presented at trial established that on February 18, 2015, the Defendant shot the victim, Labrian Lyons, multiple times while the victim was inside his

car parked outside of Firehouse Subs located near Charlotte Avenue in Nashville, Tennessee. The victim ran out of the car and to a nearby Publix grocery store where someone called the police. The Defendant fled in the victim's car, which was later recovered in Jackson, Tennessee. The victim sustained a gunshot wound to his right wrist and two gunshot wounds to his right leg. The Defendant was arrested and charged with attempted first degree murder, especially aggravated robbery, carjacking, aggravated assault, and employing a firearm during the commission of a dangerous felony.

The victim testified that he met the Defendant through Mr. Joshua Sain, with whom the victim played basketball. On five of six occasions prior to the shooting, the victim and the Defendant "hung out" and smoked marijuana at an apartment complex or other areas near Tennessee State University where the Defendant was a student. Upon learning that the Defendant was experiencing financial difficulties, the victim loaned money to the Defendant on two different occasions for a total of $500.

On February 18, 2015, the Defendant called the victim and stated that he had received a refund check from school and could repay the loan. They agreed to meet at a Firehouse Subs located near Charlotte Avenue. The victim arrived at the restaurant in his 2014 Acura TL at approximately noon or 1:00 p.m. and parked in front of the restaurant. Although it was cold and had snowed, the Defendant was sitting on the patio outside. As the victim approached the restaurant, he asked the Defendant, "What's up Reggie?" The Defendant replied that he was waiting on someone. The victim entered the restaurant where he purchased sweet tea and a cookie and returned outside. The Defendant said, "Man, I ain't waiting on them, let's just go to the car."

The victim and the Defendant went to the victim's car, where the victim sat in the driver's seat and the Defendant sat in the front passenger's seat. As the victim was setting down his drink and his cookie, he turned to see the Defendant pointing a gun at him. The Defendant said, "Man, you know what time it is. This [is] how this [is] going to go…. Take your pants off." The victim offered the Defendant money, his shoes, and his car, but the Defendant took no action to retrieve the items.

The victim testified that he did not know what the Defendant wanted and that he feared for his life. As a result, the victim attempted to take the gun away from the Defendant. During the struggle, the victim opened the passenger side door, pushed the Defendant outside of the car and onto the concrete, and got on top of the Defendant to prevent the Defendant from shooting him. At one point, two men attempted to help the victim but fled upon seeing the gun. The victim was unable to take the gun away from the Defendant. The victim denied possessing a weapon or threatening the Defendant.

- 2 -

The victim was able to get up off the ground and retreat to his car. As he attempted to start the car, the Defendant got off the ground and shot into the car three or four times. The victim got out of the car and ran to Publix located behind Firehouse Subs. The victim heard four additional gunshots behind him as he was running. As he approached Publix, a woman saw him bleeding and called the police.

The victim sustained a gunshot wound to his right wrist and two gunshot wounds to his right leg. He was transported by ambulance to a hospital where he was treated for a shattered wrist and two gunshot wounds to his leg. The victim underwent three surgeries to repair his wrist and remained in the hospital for two weeks. The victim underwent physical therapy for his wrist injury for three or four months. As a result of the injury, he could not move his wrist or pick up any items for a time period. The victim stated that his wrist, fingers, and hand were not as strong as they were prior to the injury. He also had scars on his wrist and leg and showed the scars to the jury.

The victim testified that he left his cellular phone in his car while fleeing to Publix. He later learned that his car was no longer where he had parked it. The victim subsequently recovered the car at a police impound in Jackson, Tennessee. He stated that the Defendant was from Jackson. When the victim retrieved the car, he noted that the windshield had been shot and that there were bullet holes in the middle console. All of the valuable items in the car, including the victim's cellular phone, were missing.

The victim testified that when he initially spoke to officers, he identified the shooter as "Reg" but stated that he did not know "Reg's" full name. The victim did not know the Defendant's telephone number but had it stored in his cellular phone. As a result, he was not able to provide the officers with the Defendant's telephone number. The victim called Mr. Sain to obtain the Defendant's full name and later provided officers with the Defendant's full name.

The victim acknowledged that he had a prior conviction for simple possession of marijuana and was on probation for the offense at the time of the shooting. During that time period, he was required to report to his probation officer as a condition of his probation and was not doing so. The victim also had been arrested for another charge that was still pending at the time of the trial.

On cross-examination, the victim testified that he first met the Defendant in August 2014 and that by November 2014, he felt comfortable enough with the Defendant to loan him money. The victim said that while they did not discuss a date for repayment, the Defendant was supposed to repay him once the Defendant received his refund check from school. The victim denied that his relationship with the Defendant or their meeting prior to the shooting revolved around drugs.

- 3 -

The victim acknowledged on cross-examination that contrary to his testimony on direct examination, he did not tell any of the officers that he knew the shooter as "Reg" or "Reginald." The victim explained that he wanted to obtain the Defendant's full name before providing the information to the officers. He did not tell the officers that he had "hung out" with the Defendant on four or five occasions and did not provide the officers with the name of the apartment complex where he and the Defendant "hung out." The victim provided officers with the Defendant's full name the day after the shooting.

The victim acknowledged that in March 2011, he was arrested for possession with intent to sell, manufacture, or deliver over one-half ounce of marijuana. He posted bond following his arrest but never returned to court to face the charge. In 2012, a warrant was issued for violation of his probation for a prior conviction for simple possession of marijuana. He also was charged with a felony due to his failure to appear in court. The warrants were outstanding at the time of the shooting and were still pending at the time of trial.

Reverend Alfred Attaway, Jr., Ms. Alexis Fleming, and Mr. Richard Buchanan were inside Firehouse Subs when the shooting occurred. While entering the restaurant, Ms. Fleming and Mr. Buchanan saw a man sitting alone outside on the patio even though it was cold outside and snow was on the ground.

Reverend Attaway, Ms. Fleming, and their respective boyfriend and girlfriend sat near a window and ate lunch together. Reverend Attaway saw a black Acura drive up and someone enter the car. Moments later, he saw two men fall out of the car and wrestle for a gun that was loose on the ground. Ms. Fleming identified one of the men who were wrestling for the gun as the same man who was sitting on the patio earlier. She said that one man was lying on top of the other man, that the gun was in one of the men's hands, and that the other man was reaching for the gun. Upon seeing the gun, Reverend Attaway, Ms. Fleming, and their significant others moved to the back of the restaurant. Neither Reverend Attaway nor Ms. Fleming witnessed the shooting. Reverend Attaway said he heard a total of five gunshots, while Ms. Fleming said she heard approximately three or more gunshots. Reverend Attaway did not believe that he heard additional shots following the initial shooting. They remained in the back of the restaurant until the police arrived.

After Mr. Buchanan ate lunch and discarded his trash, he heard a commotion in the front of the dining area by the windows and then heard someone say that a man had a gun. Mr. Buchanan was unable to see what was occurring in the parking lot. While others were moving toward the back of the restaurant, Mr. Buchanan testified that he did not want to do so because he feared the potential of a mass shooting. Rather, he exited

- 4 -

through a side door and walked down the sidewalk to a doctor's office where he informed those inside the office of what was occurring and instructed them to remain in the office.

Mr. Guy Austin, his son, and his son's friend, Mr. Dalton Carter, ate lunch at Firehouse Subs on the day of the shooting. When they first arrived at Firehouse Subs, Mr. Carter saw a man sitting alone outside on the patio. Mr. Carter believed this was strange because it was cold outside and there was snow on the ground. After lunch, they returned to Mr. Austin's Dodge pick-up truck in the parking lot. Mr. Carter returned to the restaurant to use the restroom, and Mr. Austin and his son waited for him in Mr. Austin's truck, which was parked beside a dark car.

While waiting for Mr. Carter, Mr. Austin felt a "jolt" on the driver's side of his truck. He looked down and saw two men involved in a scuffle underneath his truck. Mr. Austin told the men to stop fighting because he was going to drive away and run over them. However, the men continued to scuffle. Mr. Austin and his son got out of the truck and walked around to where the two men were fighting. Although Mr. Austin did not see a gun during the scuffle, he heard one of the men say, "[H]e has got a gun and he is trying to kill me." Mr. Austin and his son ran a short distance toward a nearby bank and then turned around. Mr. Austin saw a man shooting into the car. The shooter ran around to the driver's side of the vehicle, entered the car, and drove away. Mr. Austin did not see what happened to the man at whom the shooter was firing. When the police arrived, the officers went to Publix located behind the Firehouse Subs. Mr. Austin walked to the area and saw the victim bleeding from gunshot wounds.

Meanwhile, when Mr. Carter returned from the restroom, he heard people say, "[H]e's got a gun." Several customers and employees were hiding behind a counter. He looked outside and saw two men wrestling under Mr. Austin's truck. After Mr. Carter went outside to help, he saw the man who had been sitting on the patio earlier shoot a gun at the other man, who was sitting inside a car. He said he heard a total of six or seven gunshots. He ran to a nearby urgent care facility and called the police.

On cross-examination, Mr. Carter testified that he told the police officer that he did not see the shooting and that he never told the officer that he saw anyone with a gun. Mr. Carter explained that he was afraid that something might happen to him if he told the officers what he witnessed and that he did not want to testify at trial.

Officers did not locate a weapon at the scene or in the victim's belongings at the hospital. Six nine millimeter cartridge casings were recovered from the scene. Five of the six casings were from the same manufacturer. A total of $264 in cash was found on the victim.

The victim gave statements to multiple officers at the scene and at the hospital regarding the shooting, and his statements were consistent with his testimony at trial. Each officer who interviewed the victim on the day of the shooting stated that the victim did not provide them with the shooter's name or where the shooter lived and did not identify the shooter as "Reg" or "Reginald." The victim also did not tell the officers about his outstanding warrants.

While at the hospital on the afternoon following the shooting, the victim told Detective Marsha Brown of the Metro Nashville Police Department that he did not remember the shooter's name and that he would obtain the shooter's name for her. The victim called Detective Brown at 8:25 a.m. the following morning and gave her the name of the Defendant, who the victim stated was from Jackson, Tennessee. Later that afternoon, Detective Mary Taylor showed the victim a photographic array, and the victim identified the Defendant as the shooter.

Investigator Marvin Rodish of the Jackson Police Department testified that on February 22, 2015, a homeowner at an address on Middle Street in Jackson called the patrol division and reported an unfamiliar car parked in her driveway. Officer located a black Acura with a Davidson County license plate parked in the driveway. A round hole was in the windshield. The top half of the passenger side windshield was missing, and the bottom half was "spidered" or cracked. Officers learned that the car had been reported stolen and that the car was registered to Sherrill L. Reed, which other evidence presented at trial established was the victim's mother. Investigator Rodish contacted Ms. Reed and advised her that the car had been towed to the impound lot. The car was retrieved on March 2, 2015. Investigator Rodish later determined that the Defendant reported an address in Jackson.

The Defendant testified in his own defense. He stated that he was originally from Jackson, Tennessee. Once the Defendant moved to Nashville, he began purchasing marijuana from Mr. Sain on a weekly or bi-weekly basis and then reselling it. Mr. Sain stopped selling marijuana to the victim after Mr. Sain was accepted at a college in Georgia in August 2014. The Defendant said that Mr. Sain introduced him to the victim from whom the Defendant then began purchasing marijuana.

The Defendant testified that he purchased marijuana from the victim on fifteen to twenty occasions. The Defendant said their drug transactions generally occurred in the bathrooms of various restaurants. On February 18, 2015, at approximately 1:00 p.m., the Defendant called the victim for the purpose of purchasing one quarter of a pound of marijuana from the victim. They agreed to meet at Firehouse Subs. The Defendant walked to the restaurant, arriving at 1:25 or 1:30 p.m., and waited for the victim outside on the patio. When the victim arrived, the victim told the Defendant that he was going to

purchase food at the restaurant and that the drugs were in his car. The Defendant said they had never completed a drug transaction inside of the victim's car prior to that date.

The Defendant testified that once they got into the victim's car, the Defendant counted out $800 in cash and asked to see the marijuana. He said that upon viewing the drugs, he did not wish to purchase the drugs due to their poor quality. The Defendant said the victim became angry and accused him of "playing games." The Defendant stated that after he was unsuccessful in negotiating a lower price for the drugs, he put his money back in his pocket and that the victim pointed a gun at him. As they were struggling for the gun, the victim pushed the Defendant out of the car, and they continued to struggle for the gun while on the ground. The Defendant said that he yelled for someone to help him and that he saw a man exit a truck parked beside the victim's car. The Defendant stated that after he was able to get the gun away from the victim, the victim ran back into his car. The Defendant testified that he saw the window of the car come down and the victim reach toward the center of the console. The Defendant maintained that he believed that the victim was reaching for a gun and that the Defendant shot toward the center console to prevent the victim from retrieving a gun from the area. The victim then exited the car and fled.

The Defendant testified that he "panicked" and drove away in the car toward Jackson to speak with his parents. He abandoned the car at his cousin's home, and his father drove him to his father's home. The Defendant turned himself in three days following the shooting after his mother informed him that officers came to her home looking for him.

On cross-examination, the Defendant acknowledged that he did not see the victim with a gun when the victim returned to the car following the struggle. The Defendant did not know the number of times that he shot into the car and denied that he continued to shoot at the victim as the victim was fleeing. The Defendant explained that he did not remain at the scene because he was a convicted felon who was not allowed to be around firearms. He maintained on redirect examination that he never planned to rob or shoot the victim or take the victim's car.

The Defendant was indicted on attempted first degree murder, especially aggravated robbery, carjacking, aggravated assault resulting in serious bodily injury, and employment of a firearm during the commission of a dangerous felony. With regard to the especially aggravated robbery, the indictment charged that the Defendant intentionally or knowingly took the victim's vehicle or telephone by violence or by putting the victim in fear, that the robbery was accomplished with a deadly weapon, and that the victim suffered serious bodily injury. At the conclusion of the proof, the State elected to proceed with the victim's vehicle as the property taken from the victim.

- 7 -

Regarding the carjacking count, the indictment charged that the Defendant intentionally or knowingly took the victim's motor vehicle through the use of a deadly weapon or by force or intimidation. The State elected to proceed with the charge of carjacking through the use of a deadly weapon. The indictment did not list the predicate dangerous felony upon which the charge of employment of a firearm during the commission of a dangerous felony was based. The State elected carjacking as the predicate dangerous felony.

The jury subsequently returned a verdict convicting the Defendant of attempted voluntary manslaughter as a lesser-included offense of attempted first degree murder, especially aggravated robbery, and aggravated assault resulting in serious bodily injury. The jury acquitted the Defendant of carjacking and employment of a firearm during the commission of a dangerous felony.

## Sentencing Hearing

Prior to the sentencing hearing, the trial court allowed trial counsel to withdraw and appointed other counsel to represent the Defendant. During the sentencing hearing, the State submitted the Defendant's presentence report and a certified copy of a judgment for the Defendant's prior aggravated assault conviction out of Madison County. The State also presented the testimony of Mr. Dreshun Govan over the objection of defense counsel. Mr. Govan testified about the details of a pending charge against the victim.

Mr. Govan testified that he met the Defendant through a mutual friend and that they became close friends as a result. At times, the Defendant lived with Mr. Govan while they were both students at Tennessee State University. The Defendant moved out following a disagreement.

Mr. Govan testified that on January 29, 2015, Mr. Govan was driving his girlfriend's car and was stopped at a traffic light near campus when he saw the Defendant exit a car that was stopped behind him. The Defendant fired seven or eight gunshots at the car which Mr. Govan was driving. Mr. Govan identified photographs of bullet holes in the car that were caused by the Defendant. Mr. Govan drove away and was subsequently pulled over by a police officer for speeding and running red lights. Mr. Govan reported the shooting to the officer.

The Defendant was allowed to make an allocution during which he maintained that he was innocent of the offenses and denied that he was the shooter. The Defendant said he presented a self-defense claim at trial because trial counsel asserted that it was in his best interest to do so.

After taking the matter under advisement, the trial court issued an order in which it found that a sentence of confinement was necessary with regard to all of the convictions. The trial court applied the following enhancement factors to each of the Defendant's convictions: (1) the Defendant had a prior history of criminal convictions or behavior in addition to those necessary to establish the appropriate range; (2) the Defendant had no hesitation about committing a crime when the risk to human life was high; and (3) the Defendant was previously adjudicated to have committed a delinquent act that would have constituted a felony if committed by an adult. *See* T.C.A. § 40-35-114(1), (10), (16) (2014). The trial court also found that the enhancement factor in Tennessee Code Annotated section 40-35-114(9), that the Defendant employed a firearm during the commission of the offense, applied to the Defendant's convictions for aggravated assault and attempted voluntary manslaughter. Finally, the trial court applied the following enhancement factors to the Defendant's conviction for attempted voluntary manslaughter: (1) the personal injuries inflicted upon the victim were particularly great and (2) The Defendant intentionally inflicted serious bodily injury on another person. *See id.* § 40-35-114(6), (12).

The trial court did not apply any mitigating factors. After weighing the enhancement factors, the trial court sentenced the Defendant to twenty-three years for especially aggravated robbery, five years for aggravated assault, and four years for attempted voluntary manslaughter.

The trial court found that aggravated assault was a lesser-included offense of especially aggravated robbery and merged the conviction for aggravated assault into the conviction for especially aggravated robbery. The trial court declined to merge the convictions for attempted voluntary manslaughter and especially aggravated robbery, finding that "neither offense is a lesser-included offense of the other."

The trial court required the Defendant to serve his sentences for especially aggravated robbery and attempted voluntary manslaughter consecutively. In doing so, the trial court found that the Defendant had an extensive record of criminal activity. *Id.* § 40-35-115(b)(2). The trial court also found that the Defendant was a "dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." *Id.* § 40-35-115(b)(4). In concluding that the Defendant was a dangerous offender, the trial court also found that the imposition of consecutive sentences was reasonably related to the severity of the offenses and was necessary to protect the public from further criminal acts of the Defendant. Accordingly, the trial court imposed an effective sentence of twenty-seven years.

## ANALYSIS

On appeal, the Defendant contends that (1) the jury returned inconsistent verdicts; (2) the trial court erred in declining to merge the attempted voluntary manslaughter conviction into the especially aggravated robbery conviction; (3) and his sentences are excessive.

### A. Inconsistent Verdicts

The Defendant contends that the trial court "should have vacated the findings of the jury sua sponte as its verdicts were inconsistent/incongruous." The Defendant maintains that the convictions for attempted voluntary manslaughter and especially aggravated robbery were inconsistent. He submits that as a result, the verdicts were against the weight of the evidence and that the trial court should have granted a new trial following the guilty verdicts.

The only authority cited by the Defendant in support of his claim is Tennessee Rule of Criminal Procedure 33(d) which provides, "The trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence. Upon request of either party, the new trial shall be conducted by a different judge." The Defendant did not cite to any authority to support his claim that his verdicts are inconsistent or that the trial court may set aside verdicts based on inconsistency. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."); Tenn. R. App. P. 27(a)(7) (A brief shall include "[a]n argument … setting forth … the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record … relied on."). Regardless, the Defendant is not entitled to relief.

Tennessee Rules of Criminal Procedure 33(d) imposes a mandatory duty on the trial judge to serve as the thirteenth juror in every criminal case. *State v. Carter*, 896 S.W.2d 119, 122 (Tenn. 1995). The "thirteenth juror rule" requires that the trial court weigh the evidence and grant a new trial "if the evidence preponderates against the weight of the verdict." *State v. Blanton*, 926 S.W.2d 953, 958 (Tenn. Crim. App. 1996). When a trial judge overrules a motion for new trial, absent any evidence that the trial court expressed dissatisfaction or disagreement with the weight of the evidence or the verdict, this court presumes that the trial judge served as the thirteenth juror and approved the jury's verdict. *Carter*, 896 S.W.2d at 122. Once the trial court fulfills its duty as the thirteenth juror and imposes a judgment, appellate review is limited to determining the

sufficiency of the evidence. *State v. Moats*, 906 S.W.2d 431, 435 (Tenn. 1995) (citing *State v. Burlison*, 868 S.W.2d 713, 719 (Tenn. Crim. App. 1993)).

After reading the jury's verdicts to the Defendant, the trial court stated that the verdicts would "become the judgment of the Court." The trial court subsequently overruled the Defendant's motion for new trial. We presume that the trial court served as the thirteenth juror and approved the jury's verdict. Therefore, the trial court fulfilled its duty as the thirteenth juror.

While the Defendant maintains that the verdicts are inconsistent, our supreme court has stated that "inconsistent jury verdicts are not a basis for relief." *State v. Davis*, 466 S.W.3d 49, 77 (Tenn. 2015). The Defendant does not otherwise challenge the sufficiency of the evidence supporting the convictions. Accordingly, the Defendant is not entitled to relief regarding this issue.

## B. Merger

The Defendant maintains that the trial court erred in declining to merge his conviction for attempted voluntary manslaughter into his conviction for especially aggravated robbery. The State responds that the Defendant waived the issue due to an inadequate brief. We agree with the State.

The State first asserts that the Defendant waived the issue for failing to identify the issue for review in his appellate brief. The Defendant, however, identified as the first issue in this brief whether "[t]he Trial Court misapplied T.C.A. § 40-35-115 in making [the Defendant's] sentences run consecutively, as it should have merged all of the convictions" into his conviction for especially aggravated robbery. We conclude that the Defendant sufficiently identified merger as an issue in his brief.

The State further asserts that the Defendant waived the issue by failing to cite to authority. In discussing the issue in his brief, the Defendant argued that the trial court's findings that he "is an offender whose record of criminal activity is extensive" and that he "is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high" pursuant to Tennessee Code Annotated section 40-35-115(b)(2) and (b)(4) are not supported by the evidence. The Defendant then argued that "[t]he trial court's running such separate convictions consecutively constitutes double jeopardy." The Defendant, however, failed to cite to any authority or provide any analysis to demonstrate that the dual convictions violate the principles of double jeopardy. Despite the fact that the State raised the waiver argument in its brief, the Defendant did not file a reply brief in an effort to rectify the

- 11 -

inadequacies of his initial brief.  Accordingly, this issue is waived.  *See* Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b).

## C.  Sentencing

The Defendant contends that the trial court erred in imposing the sentences. Specifically, the Defendant asserts that the trial court erred in allowed Mr. Govan to testify during the hearing, that the trial court misapplied enhancement factors and erred in declining to apply mitigating factors, and that the trial court erred in ordering consecutive sentences.

### 1.  Mr. Govan's Testimony

The Defendant maintains that the trial court erred in allowing Mr. Govan to testify during the sentencing hearing.  He asserts that the State did not provide his defense counsel with discovery related to Mr. Govan's testimony and that as a result, his defense counsel was unable to investigate Mr. Govan's version of events.  However, the Defendant did not raise this argument during the sentencing hearing.  Rather, defense counsel objected to the testimony as irrelevant.  Accordingly, this argument is waived. *See Cauthern v. State*, 145 S.W.3d 571, 599 (Tenn. Crim. App. 2004) ("[A]n issue raised for the first time on appeal is waived.").

The Defendant also argues that "[p]ermitting the State to put on evidence in the form of alleged victim testimony at a sentencing hearing from an[ ] unrelated pending case is reversible error that warrants remanding for resentencing."  The Defendant failed to cite to any authority to support this proposition and failed to specify how the admission of such evidence was improper.  Therefore, the issue is waived.  *See* Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b).  As stated below, Mr. Govan's testimony was relevant to the Defendant's record of criminal activity, which the trial court considered in ordering the Defendant to serve his sentences for especially aggravated robbery and attempted voluntarily manslaughter consecutively.

### 2.  Length of Sentences

A trial court's sentencing decisions are generally reviewed for abuse of discretion, with a presumption of reasonableness granted to within-range sentences that reflect a proper application of the purposes and principles of sentencing.  *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012).  A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the party complaining.  *State v. Herron*, 461 S.W.3d 890, 904 (Tenn. 2015).  The court

will uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. Even if the trial court "recognizes and enunciates several applicable mitigating factors, it does not abuse its discretion if it does not reduce the sentence from the maximum on the basis of those factors." *State v. Carter*, 254 S.W.3d 335, 345 (Tenn. 2008). The trial court is "to be guided by – but not bound by – any applicable enhancement or mitigating factors when adjusting the length of a sentence." *Bise*, 380 S.W.3d at 706. Further, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id*. A sentence imposed by the trial court that is within the appropriate range should be upheld "[s]o long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute." *Id*. The appealing party bears the burden of proving that the sentence was improper. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

In determining the sentence, the trial court must consider: (1) any evidence received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the applicable mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant wishes to make in the defendant's own behalf about sentencing. T.C.A. § 40-35-210(b). "The sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed," and "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." *Id*. § 40-35-103(4), (5).

As a Range I standard offender, the Defendant was subject to a sentence of fifteen to twenty-five years for especially aggravated robbery, a Class A felony; a sentence of three to six years for aggravated assault, a Class C felony; and a sentence of two to four years for attempted voluntary manslaughter, a Class D felony. *See id*. §§ 39-12-107(a); 39-13-102(a)(1)(A)(i), (e)(1)(A)(ii) (2014); 39-13-221; 39-13-403(b); 40-35-112(a). The trial court imposed within-range sentences of twenty-three years for especially aggravated robbery, five years for aggravated assault, and four years for attempted voluntary manslaughter.

The Defendant asserts that the trial court misapplied enhancement factor (10), that "[t]he defendant had no hesitation about committing a crime when the risk to human life was high." *Id*. § 40-35-114(10). Although the trial court recognized that the risk to human life was present both with attempted voluntary manslaughter and especially

aggravated robbery, the trial court applied the enhancement factor upon finding that not only was there a risk of the victim's life but that there was a risk of the lives of others who were present in the area when the Defendant began shooting. A "trial court may consider this factor when the defendant endangers the lives of people other than the victim." *State v. Kelley*, 34 S.W.3d 471, 480 (Tenn. Crim. App. 2000). The evidence presented at trial established that others were in the area when the Defendant began shooting. Accordingly, the trial court did not abuse its discretion in applying this enhancement factor.

Although the Defendant contends that the trial court erred in failing to apply various mitigating factors, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. There is nothing in the record establishing that the trial court wholly departed from the statutes in applying the various enhancement factors and imposing the within-range sentences. Accordingly, the trial court did not abuse its discretion in imposing the sentences.

### 3. Consecutive Sentences

The "standard of appellate review for consecutive sentencing is abuse of discretion accompanied by a presumption of reasonableness." *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). The presumption of reasonableness applies only when the trial court has provided reasons on the record establishing at least one of the seven statutory bases for imposing consecutive sentences delineated in Tennessee Code Annotated section 40-35-115(b). *Id.* at 861. Any one statutory ground is sufficient for the imposition of consecutive sentences. *Id.* at 862. Tennessee Code Annotated section 40-35-115(b) allows a court to impose consecutive sentences when "[t]he defendant is an offender whose record of criminal activity is extensive" or when "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." T.C.A. § 40-35-115(b)(2), (4). When the trial court bases its decision to run sentences consecutively on the dangerous offender category, it must make the additional findings set out in *State v. Wilkerson*: that the aggregate sentence is "reasonably related to the severity of the offenses" and "necessary in order to protect the public from further criminal acts." *Pollard*, 432 S.W.3d at 863 (quoting *State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995)).

In finding that the Defendant "is an offender whose record of criminal activity is extensive" pursuant to Tennessee Code Annotated section 40-35-115(b)(2), the trial court noted that while the Defendant's criminal record was not "excessively long," his criminal history was "significant." The trial court also noted the Defendant's prior conviction for

aggravated assault, his current convictions, his actions in shooting at Mr. Govan, and his prior delinquency finding as a juvenile for possession of a Schedule II controlled substance with the intent to sell. The Defendant maintains that the trial court erred in relying upon Mr. Govan's testimony. However, "an extensive record of criminal activity may include criminal behavior which does not result in a conviction." *State v. Koffman*, 207 S.W.3d 309, 324 (Tenn. Crim. App. 2006) (citations omitted). Accordingly, the trial court properly found that the Defendant had an extensive record of criminal activity.

The Defendant also challenges the trial court's finding that the Defendant is "a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." T.C.A. § 40-35-115(b)(4). The trial court reviewed the evidence presented in the case, including "the fact that the offense took place during the day time in a public location frequented by many people and that the Defendant shot the victim as [the victim] was trying to get away." The trial court noted that the Defendant's actions toward Mr. Govan also supported its finding that the Defendant was a dangerous offender but clarified that it was not imposing consecutive sentences to punish the Defendant for his actions against Mr. Govan. The trial court found that the length of the sentence was reasonably related to the severity of the offenses for which the Defendant was convicted. *See Wilkerson*, 905 S.W.2d at 938. The trial court also found consecutive sentences were necessary to protect the public from further acts committed by the Defendant. *See id.* The record supports the trial court's findings. Accordingly, the trial court did not abuse its discretion in ordering the Defendant to serve his sentences for especially aggravated robbery and attempted voluntary manslaughter consecutively.

## CONCLUSION

For the foregoing reasons, we affirm the judgments of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE

- 15 -